**UNITED STATES ex rel., Cornelius LEWIS, Petitioner,**

**v.**

**Michael P. LANE, as Director of the Illinois Department of Corrections, Respondent.**

No. 86–2086.

United States District Court,
C.D. Illinois,
Danville Division.

Jan. 8, 1987.

Cornelius Lewis, pro se.

J. Steven Beckett, Reno, O'Byrne & Kepley, P.C., Champaign, Ill., for petitioner.

Mark Rotert, Asst. Atty. Gen., Chicago, Ill., Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND FINAL ORDER

BAKER, Chief Judge.

This is an application for habeas corpus under the provisions of 28 U.S.C. § 2254 by a prisoner in the custody of the State of Illinois who has been sentenced to death for murder. The case is extraordinary, not only because it involves a death sentence, but also because a majority of the present Justices of the Illinois Supreme Court agree that the Illinois death penalty statute violates the provisions of the Eighth Amendment. In addition, two of the Illinois Justices believe the petitioner was denied the effective assistance of counsel, contrary to the dictates of the Sixth Amendment. Moreover, the Illinois Attorney General, while the appeal of the petitioner's conviction was pending, sought remand of the case for resentencing because of errors in the prosecution's closing argument and the trial court's instructions on mitigation.

## PROCEDURAL SUMMARY

The petitioner, Cornelius Lewis, his sister, Bernice Lewis, and Willie Sangster, a Decatur resident, were indicted in Macon County, Illinois, on February 21, 1979, for the offenses of murder, armed robbery, and aggravated kidnapping arising from the robbery of the Citizens National Bank in Decatur, Illinois, on December 14, 1978. Venue was changed to Champaign County, Illinois. Willie Sangster's case was severed and the petitioner and Bernice Lewis were tried together. The petitioner was convicted on the three charges on May 23, 1979, and was sentenced to death on June 22, 1979. Bernice Lewis was also convicted and was imprisoned.

The petitioner appealed his conviction and his sentence directly to the Illinois Supreme Court which affirmed the conviction and the sentence. *People v. Lewis,* 88 Ill.2d 129, 58 Ill.Dec. 895, 430 N.E.2d 1346 (1981).[1] After an unsuccessful petition for rehearing before the Illinois Supreme Court, the petitioner sought review by certiorari in the United States Supreme Court. Certiorari was denied. *Lewis v. Illinois,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). The petitioner then, on August 16, 1982, sought post-conviction relief in the Illinois courts pursuant to the provisions of Ill. Rev.Stat. ch. 38, ¶ 122–1 *et seq.* The Illinois trial court denied post-conviction relief on July 14, 1983, and the petitioner filed a notice of appeal to the Illinois Appellate Court Fourth District. That appeal was transferred to the Supreme Court of Illinois for direct review on September 1, 1983. On November 30, 1984, the Illinois Supreme Court affirmed the trial court's order denying post-conviction relief. *People v. Lewis,* 105 Ill.2d 226, 85 Ill.Dec. 302, 473 N.E.2d 901 (1984). Rehearing was denied on February 1, 1985. The petitioner once again sought review in the United States Supreme Court but certiorari was denied on October 7, 1985. *Lewis v. Illi-*

---

1. Three Justices concurred in the court's judgment on *stare decisis* grounds based upon *People ex rel. Carey v. Cousins,* 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979), *cert. denied* 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980), but adhered to the rationale in their dissents in that case. Justice Seymour Simon dissented on the state and federal constitutional grounds advanced by the three dissenters in *Carey v. Cousins.*

*nois,* —— U.S. ——, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

On November 13, 1985, the Illinois Supreme Court granted a stay of execution to the petitioner pending his filing a petition for a writ of habeas corpus in the federal courts. The stay of execution by the Illinois Supreme Court has been extended to cover the outcome of federal habeas corpus proceedings. This habeas proceeding was commenced on March 31, 1986; evidence and arguments were heard on December 8–9, 1986, and a final supplemental memorandum was filed by the respondents on December 17, 1986.

The petitioner has exhausted all available state remedies.

### FACTUAL BACKGROUND

28 U.S.C. § 2254(d) and *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), require that a "presumption of correctness" be applied to the findings of the state court. Those findings show that a robbery of the Citizens National Bank in Decatur, Illinois, occurred shortly before 8:00 a.m. on December 14, 1978, during which Donald Bivens, a bank security guard, was shot and killed. The facts of the case as developed in *Lewis I* are as follows:

> Jodi Myers testified that, at 6:45 a.m. on the morning of the crime, she noticed two or possibly three persons in a maroon Monte Carlo automobile in the parking lot of the day-care center where she worked. As she walked near the Monte Carlo, a black man seated in the driver's seat (whom she later identified from a lineup as Maurice Farris) lowered his sun visor.

> Mary Comerford testified that, after delivering her child to the same day-care center, she returned to her car, noticing two black persons in a maroon Monte Carlo parked next to her white Mercury automobile. When she entered her car, a black man wearing a ski mask appeared in her back seat and forced her to drive away, eventually taping her eyes and hands and placing her in the trunk of the Mercury.

Kaye Pinkley, a teller at the Citizens National Bank, testified that decedent Bivens normally drove a van with five tellers from the bank's parking garage to an autobanking facility. Shortly before 8 a.m. on December 14, as decedent was about to start the van in which the tellers were seated, a tall black man pulled the right front door open, leaned his elbows on the witness's legs, ordered the tellers to remain silent, and shot decedent, as the latter apparently reached for his gun. Then the gunman and another robber took three of the tellers' five briefcases containing money for the day and banking paraphernalia, ran to a light-colored Mercury and drove away. Teller Pinkley and two other tellers later identified items recovered from the Macon County landfill as items which had been in their briefcases that morning.

Mr. and Mrs. Joseph Dennis from rural Macon County stated that, while sitting in their car near the Citizens National Bank, they saw two blacks park Mrs. Comerford's Mercury, enter the bank's parking garage, later return to the Mercury, with three black briefcases, and drive off. Gail Thompson, a florist, saw a black man or person dressed as a man, carrying a black briefcase in the vicinity of the parking lot near the bus station, where Norman Goenne, an office worker, saw the driver in a maroon Monte Carlo, waiting with the engine running, at around 7:45 a.m.

Maurice Farris testified that he and Willie Sangster (who according to the prosecution's theory was the mastermind of the robbery) surveyed the Citizens National Bank and the route to the home of Margaret Morgan, where defendant apparently was staying. On two mornings, Farris observed the tellers' routine. Sangster introduced defendant and his sister (using the names "Denise" and "Mingo") to Farris, who at trial estimated the sister's height as 5 feet 11 inches, defendant's as over 6 feet and his own as 5 feet 8 inches. The Lewises and he discussed plans for the robbery of the bank. Farris was to drive the car, the Lewises were to do the actual robbing,

and Sangster was to get $10,000 "off the top" the day after the robbery, apparently for his role in planning. On the morning of December 13, when they had intended to carry out the plan, the Lewises and Farris were unable to steal a car for use in the robbery, but they did observe the tellers' routine and drove along the route to Mrs. Morgan's. The next morning defendant and his sister, with Farris driving, went to the day-care center in the Monte Carlo looking for a car to steal. Maurice lowered his sun visor to avoid being identified. Defendant left the car and concealed himself in the back seat of Mrs. Comerford's Mercury. When she entered the car he forced her to drive away and eventually took control of her car, forcing her to get into the trunk. Defendant's sister then left Farris in the Monte Carlo, which had accompanied the Mercury, and sat on the passenger side of the front seat of the Mercury. Farris drove to a parking lot near the bus station, got some coffee at about 7:40, and waited with the motor running until defendant and his sister rejoined him, carrying one and two briefcases respectively. The Lewises concealed themselves on the floor of the maroon Monte Carlo. On the drive to Mrs Morgan's, a siren prompted comments by the sister, and defendant stated, "The guard went for his gun. I had to burn him." Except for the possibility of a perjury prosecution, Farris received total immunity in return for his testimony.

Mrs. Morgan testified that the Lewises had stayed with her beginning on December 12, 1978. On the morning of December 14, at about 8:05 or 8:10 a.m., she observed the defendants with three black briefcases. She asked Bernice Lewis whether Bernice knew that the bank had been robbed, to which Bernice, with defendant present, replied, "Did he die?" Later that morning Mrs. Morgan saw both Lewises counting a large quantity of money on her coffee table, with black briefcases and "blank money orders from the bank and money wrappers" present. Defendant gave Mrs. Morgan a paper sack to take to Willie Sangster at Jelk's

Barbership, where he worked. Later that day, Bernice Lewis and Mrs. Morgan went to a deteriorated section of Decatur to dispose of the black briefcases and a garbage bag containing two handguns, money wrappers, and other miscellaneous items. Subsequently, Mrs. Morgan and two neighbors moved these things from the garbage cans, where Bernice Lewis and she had put them, to a "dumpster." Mrs. Morgan, Shirley Brummet (a neighbor), and the Lewises drove to the Davenport, Iowa, bus station, where defendant and his sister caught the bus to Des Moines. Mrs. Morgan eventually turned over to the FBI some money which she said included that given her by defendant. Mrs. Morgan testified that she discovered a .357–Magnum handgun, which a ballistics expert indicated could have fired the bullet which killed decedent, under a mattress in the room in which the Lewises had been staying. She stated she observed the gun during a January 25 FBI consent search of the room when the agents lifted the foot of the mattress of the bed. According to her testimony the gun was located near the head of the bed and was not seen by the agents. She did not then mention the gun to them but later that day took it to a friend's home from which the agents later recovered it at her direction. The agents both testified that only the lower corners of the mattress were lifted and they did not observe the gun. On January 31 Mrs. Morgan did give to FBI agents five live rounds of .357–caliber ammunition which she had earlier removed from the gun.

Barbara Rigney (one of Mrs. Morgan's children) and Florida Eubanks and Shirley Brummet (two neighbors) testified that Bernice and Cornelius Lewis had been staying at Mrs. Morgan's in mid-December, 1978. Wyonia Adams, another neighbor, testified that she and Shirley Brummet had moved garbage bags containing guns and miscellaneous items from a trash can to a "dumpster." Shirley Brummet testified that, on December 14, she had traveled with the Lewises and Mrs. Morgan to the Davenport,

Iowa, bus station. Officer McQuaid, of the Decatur police, testified that he observed a black lady carrying a sack into Jelk's Barbership on the morning of December 14, 1978.

Defendant's brother-in-law, Dwight David, testified that in late December 1978 defendant had asked him to keep a box which contained money. After he heard that defendant had been arrested, David took the money from the box, put it in a bag, and asked a friend, Mrs. Bradford, to hold it for him. He later retrieved it, and gave it, still in the bag, to the FBI, together with the box from which he had taken it. FBI Agent Ryan testified that new $20 bills with serial numbers G21536201A through G21536247A were included in the money turned over by David. Daniel Kinsella, an official of the Federal Reserve Bank, testified that numbers written on the back of a form (Exhibit 80) indicated that $20 notes with serial numbers G21536001A through G21540000A were in a shipment of currency which had been sent to the Citizens National Bank in Decatur.

Lee Jarombeck, an employee of a Minnesota car dealer, testified that defendant had rented from him the maroon Monte Carlo which had been observed in the day-care lot and eventually recovered from Farris' garage.

Defendant offered no testimony, adopting Bernice Lewis' case, which primarily emphsaized Mrs. Comerford's lineup identification of Farris as her kidnapper, and teller King's positive statements to Decatur police officers that the robbers were both male.

88 Ill.2d at 136–141, 58 Ill.Dec. 895, 430 N.E.2d 1346.

## CLAIMED CONSTITUTIONAL ERRORS

The petitioner advances a series of claims of constitutional dimension. These claims focus on two aspects of the petitioner's case—first, his conviction, and, second, his sentencing. The petitioner claims that his conviction was obtained by violation of his right under the Sixth Amendment to the effective assistance of counsel and of his right under the Fourteenth Amendment to due process of law. In the sentencing phase of his case, the petitioner claims that his right under the Sixth Amendment to the effective assistance of counsel, his right under the Eighth Amendment to be free from cruel and unusual punishment, and his right under the Fourteenth Amendment to due process of law were denied.

## THE CONVICTION

■ 1. The petitioner claims he was denied due process when a state trial judge, after recusal, appointed counsel for the petitioner. The Illinois Supreme Court answered this question on direct appeal, rejecting the petitioner's contention. The court ruled that the recused judge's order appointing counsel was a formal or ministerial act required to insure that the time pressures in the case did not interfere with the right of the petitioner to a fair trial. There is no claim by the petitioner that the state trial court purposefully appointed a lawyer to represent him who was not qualified. *Lewis I,* 88 Ill.2d at 160, 58 Ill.Dec. 895, 430 N.E.2d 1346. In connection with the appointment of counsel, the petitioner also claims that he did not consent to being represented by an attorney other than the Macon County Public Defender. The record, however, shows that the petitioner rejected the public defender as counsel. 88 Ill.2d at 161, 58 Ill.Dec. 895, 430 N.E.2d 1346. Moreover, there is no right to choice of counsel by an indigent defendant. *United States v. Davis,* 604 F.2d 474, 478 (7th Cir.1979). He is only entitled to appointment of an attorney who is competent and who has no conflict of interest with the position of the petitioner. *Id.* at 479. No error of constitutional dimension can be found in the actions of the state trial court in appointing counsel for the petitioner.

■ 2. The petitioner claims that it was a denial of due process to consolidate his trial with that of his sister Bernice because her defense theory was antagonistic to the petitioner's. The question of severance was never raised in the trial court, nor did the petitioner claim it on his appeal to the

Illinois Supreme Court. The suggestions of antagonistic defenses between the petitioner and his sister are discussed later in this memorandum opinion in connection with the ineffective assistance of counsel claims. The failure to sever, however, is a waived claim. No cause and prejudice were established sufficient to overcome this waiver. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *See also United States ex rel. Durso v. Pate,* 426 F.2d 1083 (7th Cir.1970), *cert. denied* 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971).

■ 3. The petitioner claims that the trial court's failure to grant him a mistrial after an FBI agent testified about a meeting when the petitioner was "visiting his probation officer" was a denial of due process. The record reveals that the petitioner moved for a mistrial and the trial court indicated its willingness to grant a mistrial or to admonish the jury to disregard the prejudicial testimony. As the Illinois Supreme Court observed,

> It is an overstatement to assert, as defense counsel now does, that the judge placed a "condition" on the grant of mistrial. The judge, in discussions with defendant, made it clear that "motions for severence would be considered later if it appeared that a joint trial would prejudice defendant."

88 Ill.2d at 157, 58 Ill.Dec. 895, 430 N.E.2d 1346. The petitioner elected not to have a mistrial but to go forward to verdict with that jury. In light of all the evidence in the case, there is not a reasonable probability that the "slip" in the testimony of the FBI agent might have contributed to the conviction of the petitioner. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

4. The petitioner claims that giving a deadly force instruction to the jury was plain error. The state courts rejected that claim. The petitioner now asserts a due process claim concerning the deadly force instruction. *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450 (7th Cir. 1984), will not permit this court to consider a constitutional question that was not presented in the state courts. Assuming *arguendo* that the petitioner did raise a constitutional objection in connection with the deadly force instruction, which the state court failed to address, he still cannot succeed. For a defective jury instruction to rise to the level of constitutional error, the instruction must have " 'so infected the entire trial that the resulting conviction violates due process,' not merely whether the 'instruction is undesirable, erroneous or even universally condemned.' " *United States ex rel. Huckstead v. Greer,* 737 F.2d 673, 677 (7th Cir.1984) (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

■ The statement to the jury that "a person is not justified in the use of force if he is committing a forcible felony," was intended to inform the jury about the law applicable to the evidence in the case. The victim of the shooting was attempting to draw his gun at the time he was shot. In other words, the fact that the bank guard was attempting to use deadly force to prevent the robbery did not justify the robber in using deadly force to commit the robbery. The instructions were accurate statements of the law and were supported by the evidence in the case. *See People v. Baker,* 57 Ill.App.3d 401, 403, 14 Ill.Dec. 427, 372 N.E.2d 438 (4th Dist.1978). This is no occasion for a habeas court to substitute its judgment for that of the state court on an issue such as this. *See United States ex rel. Peery v. Sielaff,* 615 F.2d 402 (7th Cir.1979).

■ 5. The petitioner claims that his Fifth and Fourteenth Amendment rights were violated by the trial court's instruction that:

> If you find that a defendant had exclusive possession of recently stolen property, and there was no reasonable explanation of that possession, you may infer that a defendant obtained possession of the property by armed robbery.

The petitioner contends that the instruction, in contravention of the dictates of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), shifted the burden of proof to him to explain away his

possession of money which the evidence indicated had been taken from the Citizens National Bank in Decatur. The trial court's instructions did not shift the burden of proof to the petitioner. The jury was told quite clearly that the state had the burden of proving the essential elements of the charged offenses beyond a reasonable doubt and that the petitioner had no burden of proof. R. Vol. I, p. C127. Viewing the trial court's instructions as a whole, the jury could not have been misled and no error of the type described in *Sandstrom v. Montana* was committed. A jury may draw rational inferences from proved facts and their use of inferences is not invalid under the Due Process Clause. *See County Court of Ulster County v. Allen*, 442 U.S. 140, 156, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979).

6. The petitioner asserts constitutional error on the part of the trial court in excluding at voir dire those prospective jurors who stated that they could not under any circumstances vote for the imposition of the death penalty. *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In oral argument and in his briefs in this court, the petitioner concedes that the *Witherspoon* argument has no merit in light of *Lockhart v. McCree*, — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

7. The petitioner claims that the prosecution violated the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to turn over a written FBI laboratory report presenting the results of head-hair analysis of the petitioner, his sister Bernice, and the accomplice, Maurice Farris. This point was argued fully in the state courts and rejected by them. The facts as developed in the state court show that the prosecution asked the FBI to analyze hairs taken from the back seat of the petitioner's automobile and from the ski mask used in the robbery which was found in the Macon County landfill. The head-hair samples were to be compared with known hair standards taken from the heads of the petitioner and his sister Bernice. The tests showed that the hairs from the ski mask did not match the hair standards from the petitioner or his sister. The results of the test were communicated orally to defense counsel on May 2, 1979. The prosecution then sought comparisons of the questioned hairs with those of the accomplice Farris. The FBI did not receive Farris' hair samples for analysis in Washington until May 9, 1979. (The report of the Farris hair analysis excluded Farris as the source of the hair in the ski mask but was inconclusive as to whether the hair from the automobile back seat could have been Farris'.)

The hearing before the trial judge on May 8, 1979, reveals a discussion between the court and counsel. Attorneys for the defense told the court that discovery had been completed, and that they had received the hair analysis report which showed the hairs taken from the car and from the ski mask did not match the standards of the petitioner or his sister, Bernice. The trial judge directed the prosecution to obtain the written reports as quickly as possible and give them to the defense. The court said that it would afford defense counsel whatever relief was necessary to permit the defense additional time to gather evidence or to secure the attendance of witnesses. (No reference could have been made to the Farris analysis since the samples were received the following day by the FBI.)

On May 21, while the trial was in progress, the FBI hand-delivered the written reports to the State's Attorney's office. Copies were made and given to the prosecutor. It is unclear whether those reports were actually delivered to the petitioner's counsel. The State's Attorney had no specific recollection of tendering copies of the report to defense counsel but felt that he had done so. Bernice Lewis' lawyer had destroyed his files and could not recall whether he had examined the report. The petitioner's lawyer, Kenneth Kinser, first said he did not recall receiving the report, but, at the post-conviction proceedings, Mr. Kinser stated that he thought he might have seen the report. The state judge presiding at the post-conviction proceedings found that it was "improbable that the prosecution accomplished all this and then

failed to advise defense counsel of the reports or the results."

■ The evidence certainly does not support the conclusion that the prosecution deliberately withheld information requested by the petitioner. Both defense counsel were aware that the hair analysis showed that the samples taken from the car and the ski masks did not belong to Bernice or Cornelius Lewis. The results also showed that the hair in the ski mask did not belong to Farris and were inconclusive as to the hair found in the back seat of the car. Assuming *arguendo*, that there was a *Brady* violation, the petitioner fails to satisfy or meet the materiality test of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Under *Agurs*, the petitioner would have to show that the withheld information resulted in a denial of the petitioner's right to a fair trial. *Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399. The withheld information would have to do more than raise the possibility that it might have aided the defense or affected the outcome of the trial. *Id.* at 110, 96 S.Ct. at 2400. It must be shown that the withheld information could have created a reasonable doubt of guilt. *Id.* at 112, 96 S.Ct. at 2401. Considering the totality of the evidence in this case, the hair analysis evidence alone could not raise a reasonable doubt of guilt. The materiality test of *Agurs* is not met.

■ 8. The petitioner claims that he was not given a fair trial because he was not proved guilty beyond a reasonable doubt. This court need not pause long in consideration of that argument. A review of the factual recitations of the Illinois Supreme Court which are set out in the beginning of this memorandum opinion show that the evidence, when viewed in the light most favorable to the prosecution, overwhelmingly supports Cornelius Lewis' conviction. There is no basis to the petitioner's contention that he was not proved guilty beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

9. The petitioner asserts numerous claims of ineffectiveness on the part of his court-appointed counsel during the trial of the case. Those arguments were considered and rejected by a majority of the Illinois Supreme Court both on direct appeal and on appeal from the orders denying post-conviction relief. Some of the petitioner's claims of ineffectiveness are repetitive in that they argue different aspects of the same alleged deficiency. This court will address each of the petitioners' claims.

(a) The petitioner asserts that his court-appointed counsel, Kenneth Kinser, lacked the "background" to be effective at trial. Coterminous with this claim are the additional claims that Mr. Kinser did insufficient research in preparation for the case and lacked issue recognition.

This court's review of the record shows ample support for the conclusion of the Illinois Supreme Court in *Lewis II* that Kinser was reasonably competent at trial. "We do not agree with the defendant that anything in the post-conviction record demonstrates that 'Mr. Kinser's age, experience, background, and personal make-up rendered him completely unequipped to act as a conscientious and zealous advocate' on behalf of the defendant." *Lewis II*, 105 Ill.2d at 246, 85 Ill.Dec. 302, 473 N.E.2d 901.

■ The record shows that Kenneth Kinser had practiced law since 1941 and had participated in over 100 criminal cases of which one-half were felonies. The state judge who appointed him had observed Kinser in six to ten criminal cases and always found him competent, aggressive and independent. The state trial judge stated that Kinser appeared confident and experienced at trial and that he performed well. Co-counsel representing Bernice Lewis also agreed that Kinser was experienced and performed competently. It is true that Mr. Kinser, in the four years preceding the Lewis trial, had not done criminal defense work and had begun to deal exclusively in real estate and probate matters. He had, however, maintained his reading in criminal trial matters and had tried to keep current in criminal law development.

■ Reasonable competence is the test for an effective appointed counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). There is nothing in this record to indicate that Mr. Kinser, by reason of his background, was not able to function as an adversary of the State's Attorney, or that he did not have the proper preparation or ability to be a reasonably effective lawyer for the petitioner. *See United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

■ (b) The petitioner next claims ineffectiveness on the part of his court-appointed counsel because: (1) Mr. Kinser counseled the petitioner to plead guilty and avoid the death penalty; (2) Mr. Kinser believed the petitioner was guilty; and (3) Mr. Kinser engaged in "confrontational communication" with the petitioner. None of these has merit.

Nothing in the record indicates Mr. Kinser openly or publicly expressed any opinion that the petitioner was guilty. It was the duty of defense counsel to discuss the evidence with his client and explore with the client the possibility of a guilty plea for a determinant sentence of imprisonment. That is not "confrontational communication." Had defense counsel not explored the possibilities of plea negotiation, he might have been considered derelict on that account. *See Tollett v. Henderson,* 411 U.S. 258, 268, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1972).

(c) The petitioner asserts a series of twenty-four claims of ineffective assistance which focuses on his attorney's preparation for trial and performance at trial. Lewis claims that his lawyer did not have a sufficient theory of defense. He says that Mr. Kinser adopted his sister Bernice's defense which was inconsistent with his and which, during the closing argument in the guilt phase of the case, became antagonistic. Lewis asserts that Kinser excluded Sharon Bowen and Mary Bird as potential alibi witnesses because of Kinser's moral judgment concerning their private conduct. Sharon Bowen, a white woman, bore a child

by Lewis, a black man. Mary Bird was ready to testify that Lewis had been cohabiting with her in Des Moines when the crime occurred. Lewis also alleges that Kinser failed to investigate an earlier, spring 1978, plot to rob the Citizens National Bank in Decatur involving Bernice Joyners, Odell Sangster and Clifford Wilson.

The petitioner and his sister had maintained that they were not present in Decatur at the time of the commission of the crime. Therefore, Mr. Kinser was left with the main defense theory that the state could not prove the case beyond a reasonable doubt and concentrated on the lack of direct identification of Lewis and his sister by the victims of the robbery. Closely connected with the claim of the lack of a defense theory is the petitioner's claim that his counsel did not develop an alibi defense with the witnesses from Iowa. The record supports the conclusion of the state court that the decision not to put the alibi witnesses on the stand once they appeared at the trial was strictly trial strategy. The defense attorneys formed the impression that the witnesses were lying and that the jury would have quickly perceived that they were lying. Kinser had contacted an attorney in Des Moines, Shirley Steele, who interviewed the witnesses there. It was Steele's opinion that the witnesses were not credible. As the Illinois Supreme Court observed in *Lewis II,* whatever "slim chance" Lewis had would have disappeared with the testimony of the alibi witnesses. *Lewis II,* 105 Ill.2d at 248, 85 Ill.Dec. 302, 473 N.E.2d 901.

■ *Strickland,* does not require that defense counsel be perfect. The petitioner must show that there is a reasonable probability that but for the lawyer's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. No such showing is made here. Had Kinser done things differently, there is no reasonable probability that the result would have been different; the evidence convicting Lewis was overwhelming. *See Lewis I,* 88 Ill.2d at 136–41, 58 Ill.Dec. 895, 430 N.E.2d 1346.

(d) The foregoing observations hold true for the remaining complaints of the petitioner about ineffectiveness in the trial phase of the case. Lewis says that Kinser did not interview eye witnesses; that Kinser lost the potential for impeachment of the accomplice, Maurice Farris, by not having a third-party present at Farris' interview; that Kinser failed to demand FBI laboratory reports on hair analysis or paraffin tests, and when he had the reports, he did not utilize them effectively; that Kinser did not move to suppress evidence of revolver cartridges that were seized at the time of Lewis' arrest in Minneapolis; that Kinser failed to move to exclude the petitioner's prior convictions in the trial phase; that Kinser yielded the right of voir dire to the judge; that Kinser did not note the jurors' race in the record; that Kinser waived the opening statement when the court did not allow him to reserve an opening statement at the conclusion of the state's evidence; and that Kinser did not object when the prosecutor asked leading questions of witnesses.

■ All these charges, even assuming they are professional errors, constitute strategic judgments by an attorney in defending a case. Anyone who has represented a criminal defendant knows that in difficult cases lawyers are faced with hard choices. If the outcome of the case is successful, then the choices are hailed as good trial tactics. On the other hand, if the outcome of the case is unsuccessful, then the choices are denounced as errors in judgment. This court must, however, eliminate the distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time of trial. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

*Strickland* is still the guide for evaluating attorney performance. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. As observed earlier, the evidence of

the petitioner's guilt is overwhelming. It is not reasonably probable that Lewis would have been found not guilty even if Mr. Kinser had done all those things that Lewis now urges Mr. Kinser should have done.

■ (e) One of the petitioner's major contentions centers on the motion for mistrial made when the FBI agent testified about seeing Lewis in the company of his probation officer. Lewis complains that his sister's attorney, Scott Diamond, had to prompt Kinser to move for a mistrial. Lewis further complains that Kinser, for the most part, followed Diamond's lead in the defense of the case, even adopting motions with misspelled words in them. The point remains, however, that Lewis' lawyer did move for a mistrial and was confronted with the hard choice of going to verdict with the jury that was hearing the case, or starting anew with a different jury and possibly a different co-defendant, Willie Sangster. Hindsight says Kinser should have insisted on a mistrial. But when viewed from counsel's perspective at the time, Kinser's choice to go forward was not irrational. Nothing suggests that a reasonable probability exists that, but for Kinser's failure to insist on a mistrial, Lewis would have been found not guilty.

Having reviewed the record, the court concludes that, in the trial phase of Lewis' case, the performance of his lawyer was not ineffective. There was no breakdown in the adversarial process. Mr. Kinser met the standard of reasonably competent counsel even though other lawyers might have done things differently or better.

## THE SENTENCING

1. The petitioner advances multiple grounds in support of his contention that he was denied a fair hearing in the sentencing phase of his prosecution, chief among which is the ineffectiveness of defense counsel. The Sixth Amendment principles providing for the effective assistance of counsel apply to a capital sentencing procedure in the same manner that they apply to the conviction phase in a criminal prosecu-

tion. *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063.

> [C]ounsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision.

*Id.* at 687, 104 S.Ct. at 2064. In the sentencing phase of the case, the vital need of the petitioner was for effective representation during the hearing on the absence of a mitigating factor.[2] The aggravating factors had been established at trial. A murder was committed in the course of an armed robbery and the statutory conditions for imposition of the death penalty were established in the absence of the existence of a mitigating factor. Ill.Rev.Stat. ch. 38, ¶ 9–1(g).

2. In the hearing on mitigation, Kenneth Kinser was left alone without the benefit he gained at trial from his ability to confer with co-counsel, Scott Diamond, a more aggressive and experienced criminal defense lawyer. *See* Testimony of Scott Diamond, Post-Conviction R. Vol. II, pp. 170–171. It is apparent from reading the record that in the sentencing proceedings Mr. Kinser pursued a passive, acquiescent role. He agreed to the introduction of erroneous evidence of four prior convictions of the petitioner without requiring proof of those convictions by the State. At the time of the hearing on the existence of a mitigating factor, the state did not possess certified copies of what it claimed were two judgments of conviction in the State of New York. If Mr. Kinser had maintained his adversarial position and required the state to prove the convictions, the State could not have done so. Instead Kinser

relied upon Lewis' agreement that the information contained in the "FBI rap sheet" shown to him by the prosecutor was correct and stipulated that the prior convictions existed.

3. The respondents argue that the question of jury reliance upon the erroneous evidence concerning the New York convictions was waived by the petitioner and cannot be raised on habeas review. It is true that the question of the New York convictions was raised for the first time in oral argument on post-conviction review in the Illinois Supreme Court. *Lewis II,* 105 Ill.2d 226, 262, 85 Ill.Dec. 302, 473 N.E.2d 901 (Clark, J. dissenting). However, at the hearing in these habeas proceedings, unquestioned evidence concerning the accuracy of the New York convictions was presented for the first time. The Assistant State's Attorney and the Assistant Attorney General who represented Illinois in the post-conviction proceedings testified that they deliberately withheld from the post-conviction judge and defense counsel documentary evidence which showed that one of the New York convictions had been dismissed and that the other conviction was for a misdemeanor with a three-month sentence. No evidence was ever introduced in the sentencing phase to show whether the midsdemeanor conviction was an uncounselled plea. *See* 105 Ill.2d at 263, 85 Ill. Dec. 302, 473 N.E.2d 901 (Clark, J. dissenting).

■ The fact that the Assitant State's Attorney and Assistant Attorney General concealed the evidence about the New York convictions from the petitioner and the post-conviction judge constitutes cause for

---

2. Ill.Rev.Stat. ch. 38, ¶ 9–1(c) provides:

(c) Consideration of factors in Aggravation and Mitigation. The court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to those factors set forth in subsection (b). Mitigating factors may include but need not be limited to the following:

1. the defendant has no significant history of prior criminal activity;

2. the murder was committed while the defendant was under the influence of extreme

mental or emotional disturbance, although not such as to constitute a defense to prosecution;

3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;

5. the defendant was not personally present during commission of the act or acts causing death.

the petitioner's failure to raise the point in his post-conviction proceedings. *Cf.* Ill. Rev.Stat. ch. 110A, Canon 7, Rule 7–103(b) (prosecutor's continuing duty to disclose). The deliberate conduct of the prosecution is an "objective factor external to the defense" which impeded the petitioner's effort to comply with Illinois' procedural rules. *Murray v. Carrier,* —— U.S. ——, 106 S.Ct. 2678, 91 L.Ed.2d 427 (1986).

4. The erroneous inclusion of the New York convictions in the evidence before the jury prejudiced the petitioner. Any trial judge who has sentenced a defendant for a criminal offense knows that two prior convictions constitute an aggravating factor which bears strongly on deciding upon an appropriate disposition in the case. Four prior convictions would indicate an absence of mitigating considerations and a life committed to criminal activity. The erroneous evidence of the two New York convictions must have weighed heavily in the minds of the jury.

5. Added to Mr. Kinser's error in acquiesing in the State's claim of four prior convictions, he failed to marshall and present any evidence which focused on the petitioner's individuality as a human being. However contemptible Lewis' conduct may have been, and however unappealing his lifestyle was, some effort should have been made by defense counsel to portray the petitioner as an individual and a human being. Mr. Kinser did not do that. He presented no evidence on behalf of the petitioner. Instead, he relied almost exclusively, the record shows, on a religious and philosophic appeal. He reminded the jury that: "Vengeance is mine, says the Lord," and urged the jury not to take that vengeance into their own hands. R. Vol. X, B–294.

> [A] failure to consider relevant aspects of a defendant's character and background creates such an unacceptable risk that the death penalty was unconstitutionally imposed that, even in cases where the matter was not raised below, the "interests of justice" may impose on reviewing courts "a duty to remand [the] case for resentencing."

*Strickland,* 466 U.S. at 705, 104 S.Ct. at 2073 (Brennan, J. concurring in part and dissenting in part, quoting *Eddings v. Oklahoma,* 455 U.S. 104, 117, n., and 119, 102 S.Ct. 869, 878, n., and 879, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring)).

6. In addition, the prosecutor was permitted to argue outside the record and without objection about another murder in Decatur where the death penalty was not imposed. The prosecutor suggested to the jury that Lewis' victim might not have been killed had the jury in the other murder case imposed the death penalty. Any reasonably competent attorney would have objected to such a prejudicial argument.

7. The petitioner also challenges the giving, at the sentencing hearing, of People's Instruction # 5 which reads:

> If the jury determines unanimously that there are no mitigating factor or factors sufficient to preclude the imposition of the death sentence, then the court must sentence the defendant to death.

Standing alone, the instruction is an accurate statement of the law of Illinois concerning the absence of a mitigating factor. Ill.Rev.Stat. ch. 38, ¶ 9–1. This instruction, however, did not stand alone. During closing argument at sentencing, the prosecutor told the jury:

> I would suggest to you that there are—there is only one appropriate verdict. And it reads basically that we, the jury, find no mitigating factor exists to preclude the imposition of the death penalty. No mitigating factor exists. If you find a mitigating factor exists, that means that the death penalty could not be imposed. If you find a mitigating factor exists which is sufficient, then you may choose that verdict. You may even find a mitigating factor exists but say it's not sufficient to preclude the imposition of the death penalty.

R. Vol. X, p. B–292. The petitioner's attorney failed to argue to the jury that if even one of them believed a mitigating factor did exist, then the sentence of death could not be imposed. That failure coupled with the prosecutor's argument on the point,

raises concern that the instruction was erroneously interpreted by the jury.

8. The cumulative effect of the professional errors by defense counsel at the sentencing phase abridged the petitioner's Sixth Amendment rights. Such errors include: Kinser's failure to explain the jury instruction on mitigation made questionable by the prosecutor's argument; Kinser's failure to object to the prosecutor's argument about the unrelated murder in Decatur; his failure to individualize the petitioner as a human being, instead merely presenting an abstract religious argument; and his acquiescence in the receipt of erroneous evidence. These errors, taken together, raise a reasonable doubt that, but for defense counsel's errors, the outcome of the sentencing procedure would have been different, and Lewis would not have been sentenced to death.

9. *Strickland* teaches us that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063. It is a fair inference from the record that by the time the sentencing phase was reached, the petitioner's lawyer had assumed a passive, unresisting posture in his conduct of the defense. That posture is demonstrated most vividly by Mr. Kinser's failure to insist on proof of the petitioner's prior convictions. A guardian *ad litem* in a probate proceeding for an incompetent would have insisted on strict proof from an adversary. Surely, defense counsel in a capital punishment case on a highly crucial point would be expected to meet that low standard. *See Lewis II,* 105 Ill.2d at 262, 85 Ill.Dec. 302, 473 N.E.2d 901 (Clark, J. dissenting). Mr. Kinser's abandonment of his role as an adversary at the sentencing phase undermines the court's confidence in the outcome of the sentencing procedure. "... [D]espite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just

results." *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2063.

10. The petitioner raises two additional points concerning the sentencing phase of the proceedings. First, he challenges the trial court's failure to conduct a voir dire examination of the jury after verdict and before sentencing. Second, the petitioner complains of the Illinois Supreme Court's affirmance of his death sentence despite the Illinois Attorney General's "confession of error" during the direct appeal. It is unnecessary to rule upon these points because of this court's conclusion that the petitioner was denied effective assistance of counsel at sentencing. However, the two points reinforce the court's conclusion that there was a breakdown in the adversarial process in the sentencing phase.

11. The petitioner also challenges the direct appeal of the post-conviction proceedings to the Illinois Supreme Court, bypassing the Illinois Appellate Court in the process. The jurisdiction of the Illinois Supreme Court to hear the post-conviction proceedings by direct appeal is a matter of Illinois procedure and not a concern of federal courts. No denial of due process is manifest. Moreover, the direct appeal to the Illinois Supreme Court furthers the application of uniform and objective standards in the review of death sentences described in *Gregg v. Georgia,* 428 U.S. 153, 204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976).

12. The petitioner also argues that during trial a plea agreement for a sixty-year sentence was offered to him which he rejected and that he was subsequently sentenced to death as a punishment for insisting on his right to trial by jury. There is no merit in that contention. The prosecution may seek a more severe penalty than that which was offered in a rejected plea agreement. *See Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).

## THE ILLINOIS DEATH PENALTY ACT

The petitioner advances two arguments attacking the Illinois Death Penalty Act itself. The petitioner first argues that the Illinois Death Penalty Act is racially discriminatory. There is no merit to this claim nor is there an evidentiary basis for it. *See* Discussion in *Lewis II,* 105 Ill.2d at 250 *et seq.,* 85 Ill.Dec. 302, 473 N.E.2d 901.

Second, the petitioner argues that the Illinois Death Penalty Act is unconstitutional and violative of the Eighth Amendment because it permits an Illinois prosecutor to make a standardless request for the death penalty contrary to the rationale stated in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) as explained in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The petitioner's arguments are significant and raise grave doubts about the constitutionality of the Illinois Act. *See People ex rel. Carey v. Cousins,* 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979) (Ryan, J., Goldenhirsh, C.J., and Clark, J. dissenting) and *People v. Lewis,* 88 Ill.2d 129, 58 Ill.Dec. 895, 430 N.E.2d 1346 (Simon, J. dissenting). The question raised by the petitioner goes beyond the Supreme Court's discussions in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and requires the interpretation of a statute which is different from the death penalty statutes in Georgia, Florida, and Texas. In those states the prosecutor is given the discretion whether to prosecute or not. In Illinois, each prosecutor is given the double discretion of whether to prosecute and if so, what penalty to seek. Whether the second aspect of the Illinois prosecutor's discretion is standardless remains to be decided.

It is a time honored and salutary principle that courts should avoid deciding a new constitutional question when other adequate grounds for decision are present in the case. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring). Notwithstanding that well-established principle, the petitioner, and apparently the Chief Justice of the Illinois Supreme Court, would have the federal courts decide the question.

It is apparent that the General Assembly and a majority of the electorate of this State desire that the death penalty be available as a sanction in certain types of cases. If this court were the final tribunal to determine the validity of the statute in its present form I would continue to dissent in the hope that ultimately a majority of the court would agree or that the General Assembly might be persuaded to effect the amendments which I consider necessary render the statute valid. In this situation, however, the Supreme Court can grant certiorari and decide the questions on which this court is divided.

*People v. Lewis,* 88 Ill.2d at 166, 58 Ill.Dec. 895, 430 N.E.2d 1346 (Goldenhirsh, C.J. concurring). It is this court's judgment that deciding that the Illinois Death Penalty Act is unconstitutional when it is not necessary should be avoided and that Illinois is far better equipped than a federal court to resolve its own troublesome social questions.

In accordance with the conclusions contained in this memorandum opinion,

IT IS ORDERED that a writ of habeas corpus issue in this case vacating the petitioner's sentence of death. The State has 120 days to resentence the petitioner, or he shall be released.[3]

On the court's own motion, the execution of this order is stayed pending appeal by the parties.

---

**3.** For similar relief *see North Carolina v. Pearce,* 395 U.S. 711, 714, 89 S.Ct. 2072, 2074, 23 L.Ed.2d 656 (1969).