832 F.2d 1446
 Cornelius LEWIS, Petitioner-Appellee,
v.
Michael LANE and James Thieret, Illinois Department of
Corrections, Respondents-Appellants.
Cornelius LEWIS, Petitioner-Appellant,
v.
Michael LANE, Director of the Illinois Department of
Corrections, and James Thieret, Warden of Menard
Correctional Center, Respondents-Appellees.
 Nos. 87-1103, 87-1171.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 28, 1987.
Decided Nov. 4, 1987.
Rehearing Denied Dec. 9, 1987.
 
 J. Steven Beckett, Reno O'Byrne & Kepley, Champaign, Ill., for petitioner-appellee.
 Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for respondents-appellants.
 Before CUMMINGS, CUDAHY, and COFFEY, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Petitioner, Cornelius Lewis, his sister, Bernice Lewis, and Willie Sangster were indicted in Macon County, Illinois, on February 21, 1979, and charged with the offenses of murder, armed robbery, and aggravated kidnapping in connection with the robbery of the Citizens National Bank in Decatur, Illinois, on December 14, 1978, during which a bank security guard was shot and killed. Sangster's case was continued and petitioner and his sister Bernice were tried together. A jury found both guilty of all three charges. Petitioner was subsequently sentenced to death for murder. Bernice was sentenced to concurrent prison terms of forty years for murder, thirty years for armed robbery, and thirty years for aggravated kidnapping.
 
 
 2
 The Illinois Supreme Court on direct appeal affirmed petitioner's conviction and death sentence. People v. Lewis, 88 Ill.2d 129, 58 Ill.Dec. 895, 430 N.E.2d 1346 (1981). The Supreme Court of the United States subsequently denied certiorari. Lewis v. Illinois, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308. Petitioner then sought post-conviction relief in the Illinois courts. See Ill.Rev.Stat. ch. 38, p 122-1 et seq. An Illinois circuit court denied post-conviction relief, and the Illinois Supreme Court again on direct appeal affirmed the lower court's order. People v. Lewis, 105 Ill.2d 226, 85 Ill.Dec. 302, 473 N.E.2d 901 (1984). Certiorari was again denied. Lewis v. Illinois, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153.
 
 
 3
 On November 13, 1985, the Illinois Supreme Court granted petitioner a stay of execution pending his filing a petition for a writ of habeas corpus. The stay was subsequently extended to cover the outcome of the federal habeas corpus proceedings which were commenced pursuant to 28 U.S.C. Sec. 2254 on March 31, 1986. The habeas petition challenged both the conviction and the death sentence. Petitioner claimed that his conviction had been obtained in violation of his right under the Sixth Amendment to effective assistance of counsel. He further claimed that his Sixth Amendment right to effective assistance of counsel had also been denied during the sentencing phase of his case. Finally, he claimed that the Illinois Death Penalty Act, Ill.Rev.Stat. ch. 38, p 9-1, was unconstitutional under the Eighth and Fourteenth Amendments.
 
 
 4
 The district court held that petitioner had failed to demonstrate ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, during the guilt phase of his trial. See United States ex rel. Lewis v. Lane, 656 F.Supp. 181 (C.D.Ill.1987). However, the court held that he had been denied his Sixth Amendment right to effective assistance of counsel during the sentencing phase of his prosecution and accordingly issued a writ of habeas corpus vacating the death sentence and ordering resentencing. In light of its holding with regard to petitioner's sentencing, it did not reach the constitutionality of the Illinois Death Penalty Act. Respondent appeals the court's grant of the writ of habeas corpus ordering resentencing. Petitioner cross-appeals the district court's denial of relief as to his conviction. We affirm.
 
 I.
 
 5
 28 U.S.C. Sec. 2254(d) provides that the factual findings of a state court are presumed to be correct in a federal habeas corpus proceeding. See Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722. Like the district court, we adopt the Illinois Supreme Court's following statement of facts in People v. Lewis, 88 Ill.2d 129, 136-41, 58 Ill.Dec. 895, 898-90, 430 N.E.2d 1346, 1349-51 (1981):
 
 
 6
 "The testimony of the principal witnesses was as follows. Jodi Myers testified that, at 6:45 a.m. on the morning of the crime, she noticed two or possibly three persons in a maroon Monte Carlo automobile in the parking lot of the day-care center where she worked. As she walked near the Monte Carlo, a black man seated in the driver's seat (whom she later identified from a line-up as Maurice Farris) lowered his sun visor.
 
 
 7
 "Mary Comerford testified that, after delivering her child to the same day-care center, she returned to her car, noticing two black persons in a maroon Monte Carlo parked next to her white Mercury automobile. When she entered her car, a black man wearing a ski mask appeared in her back seat and forced her to drive away, eventually taping her eyes and hands and placing her in the trunk of the Mercury.
 
 
 8
 "Kaye Pinkley, a teller at the Citizens National Bank, testified that decedent Bivens normally drove a van with five tellers from the bank's parking garage to an auto-banking facility. Shortly before 8 a.m. on December 14, as decedent was about to start the van in which the tellers were seated, a tall black man pulled the right front door open, leaned his elbows on the witness's legs, ordered the tellers to remain silent, and shot decedent, as the latter apparently reached for his gun. Then the gunman and another robber took three of the tellers' five briefcases containing money for the day and banking paraphernalia, ran to a light-colored Mercury and drove away. Teller Pinkley and two other tellers later identified items recovered from the Macon County landfill as items which had been in their briefcases that morning.
 
 
 9
 "Mr. and Mrs. Joseph Dennis from rural Macon County stated that, while sitting in their car near the Citizens National Bank, they saw two blacks park Mrs. Comerford's Mercury, enter the bank's parking garage, later return to the Mercury, with three black briefcases, and drive off. Gail Thompson, a florist, saw a black man or person dressed as a man, carrying a black briefcase in the vicinity of the parking lot near the bus station, where Norman Goenne, an office worker, saw the driver in a maroon Monte Carlo, waiting with the engine running at around 7:45 a.m.
 
 
 10
 "Maurice Farris testified that he and Willie Sangster (who according to the prosecution's theory was the mastermind of the robbery) surveyed the Citizens National Bank and the route to the home of Margaret Morgan, where defendant apparently was staying. On two mornings, Farris observed the tellers' routine. Sangster introduced defendant and his sister (using the names 'Denise' and 'Mingo') to Farris, who at trial estimated the sister's height as 5 feet 11 inches, defendant's as over 6 feet and his own as 5 feet 8 inches. The Lewises and he discussed plans for the robbery of the bank. Farris was to drive the car, the Lewises were to do the actual robbing, and Sangster was to get $10,000 'off the top' the day after the robbery, apparently for his role in planning. On the morning of December 13, when they had intended to carry out the plan, the Lewises and Farris were unable to steal a car for use in the robbery, but they did observe the tellers' routine and drove along the route to Mrs. Morgan's. The next morning defendant and his sister, with Farris driving, went to the daycare center in the Monte Carlo looking for a car to steal. Maurice lowered his sun visor to avoid being identified. Defendant left the car and concealed himself in the back seat of Mrs. Comerford's Mercury. When she entered the car he forced her to drive away and eventually took control of her car, forcing her to get into the trunk. Defendant's sister then left Fanis in the Monte Carlo, which had accompanied the Mercury, and sat on the passenger side of the front seat of the Mercury. Farris drove to a parking lot near the bus station, got some coffee at about 7:40, and waited with the motor running until defendant and his sister rejoined him, carrying one and two briefcases respectively. The Lewises concealed themselves on the floor of the maroon Monte Carlo. On the drive to Mrs. Morgan's, a siren prompted comments by the sister, and defendant stated, 'The guard went for his gun. I had to burn him.' Except for the possibility of a perjury prosecution, Farris received total immunity in return for his testimony.
 
 
 11
 "Mrs. Morgan testified that the Lewises had stayed with her beginning on December 12, 1978. On the morning of December 14, at about 8:05 or 8:10 a.m., she observed the defendants with three black briefcases. She asked Bernice Lewis whether Bernice knew that the bank had been robbed, to which Bernice, with defendant present, replied, 'Did he die?' Later that morning Mrs. Morgan saw both Lewises counting a large quantity of money on her coffee table, with black briefcases and 'blank money orders from the bank and money wrappers' present. Defendant gave Mrs. Morgan a paper sack to take to Willie Sangster at Jelk's Barbershop, where he worked. Later that day, Bernice Lewis and Mrs. Morgan went to a deteriorated section of Decatur to dispose of the black briefcases and a garbage bag containing two handguns, money wrappers, and other miscellaneous items. Subsequently Mrs. Morgan and two neighbors moved these things from the garbage cans, where Bernice Lewis and she had put them, to a 'dumpster.' Mrs. Morgan, Shirley Brummet (a neighbor), and the Lewises drove to the Davenport, Iowa, bus station, where defendant and his sister caught the bus to Des Moines. Mrs. Morgan eventually turned over to the FBI some money which she said included that given her by defendant. Mrs. Morgan testified that she discovered a .357-Magnum handgun, which a ballistics expert indicated could have fired the bullet which killed decedent, under a mattress in the room in which the Lewises had been staying. She stated she observed the gun during a January 25 FBI consent search of the room when the agents lifted the foot of the mattress on the bed. According to her testimony the gun was located near the head of the bed and was not seen by the agents. She did not then mention the gun to them but later that day took it to a friend's home from which the agents later recovered it at her direction. The agents both testified that only the lower corners of the mattress were lifted and they did not observe the gun. On January 31 Mrs. Morgan did give to FBI agents five live rounds of .357-caliber ammunition which she had earlier removed from the gun.
 
 
 12
 "Barbara Rigney (one of Mrs. Morgan's children) and Florida Eubanks and Shirley Brummet (two neighbors) testified that Bernice and Cornelius Lewis had been staying at Mrs. Morgan's in mid-December, 1978. Wyonia Adams, another neighbor, testified that she and Shirley Brummet had moved garbage bags containing guns and miscellaneous items from a trash can to a 'dumpster.' Shirley Brummet testified that, on December 14, she had traveled with the Lewises and Mrs. Morgan, to the Davenport, Iowa, bus station. Officer McQuaid, of the Decatur police, testified that he observed a black lady carrying a sack into Jelk's Barbershop on the morning of December 14, 1978.
 
 
 13
 "Defendant's brother-in-law, Dwight David, testified that in late December 1978 defendant had asked him to keep a box which contained money. After he heard that defendant had been arrested, David took the money from the box, put it in a bag, and asked a friend, Mrs. Bradford, to hold it for him. He later retrieved it, and gave it, still in the bag, to the FBI, together with the box from which he had taken it. FBI Agent Ryan testified that new $20 bills with serial numbers G21536201A through G21536247A were included in the money turned over by David. Daniel Kinsella, an official of the Federal Reserve Bank, testified that numbers written on the back of a form (Exhibit 80) indicated that $20 notes with serial numbers G21536001A through G21540000A were in a shipment of currency which had been sent to the Citizens National Bank in Decatur.
 
 
 14
 "Lee Jarombeck, an employee of a Minnesota car dealer, testified that defendant had rented from him the maroon Monte Carlo which had been observed in the day-care lot and eventually recovered from Farris' garage.
 
 
 15
 "Defendant offered no testimony, adopting Bernice Lewis' case, which primarily emphasized Mrs. Comerford's lineup identification of Farris as her kidnapper, and teller King's positive statements to Decatur police officers that the robbers were both male."
 
 II.
 
 16
 The focus of both the principal appeal and the cross-appeal is whether petitioner was denied effective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments. On the principal appeal the State challenges the district court's determination that the performance of petitioner's attorney during the sentencing phase was constitutionally deficient. On the cross-appeal petitioner challenges the court's determination that he did not receive ineffective representation within the meaning of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, during the guilt phase of the proceedings.
 
 
 17
 "The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305; see Strickland v. Washington, 466 U.S. at 686, 104 S.Ct. at 2063; United States v. Cronic, 466 U.S. 648, 655-57, 104 S.Ct. 2039, 2044-46, 80 L.Ed.2d 657. In discussing the content of the Sixth Amendment right to effective assistance of counsel, the Supreme Court has emphasized the importance of the adversarial process and the critical role of counsel in ensuring its proper functioning. Strickland, 466 U.S. at 686, 104 S.Ct. at 2063. In United States v. Cronic, 466 U.S. at 656-57, 104 S.Ct. at 2045-46, the Court declared:
 
 
 18
 The right to effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted--even if defense counsel may have made demonstrable errors--the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.
 
 
 19
 In order to establish an ineffective assistance claim, a defendant must show that his counsel's performance fell below basic standards of competence and that the resulting errors so prejudiced his defense as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. The defendant, not the State, bears the burden of proving both incompetence and prejudice. Id. There is a strong presumption that counsel's performance falls within "the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. at 2065. To overcome this presumption, the defendant must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by reference to prevailing professional norms. Id. at 688, 104 S.Ct. at 2064. The reasonableness of counsel's performance should be evaluated not with hindsight but from counsel's perspective at the time of the alleged error and in light of all the circumstances. Id. at 689, 104 S.Ct. at 2065.
 
 
 20
 That counsel's representation was professionally unreasonable, however, is not enough to constitute ineffective assistance under the Sixth Amendment. The defendant must also show that any deficiencies in counsel's performance actually prejudiced his or her defense. The appropriate test for prejudice is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the result. Id. As the Supreme Court indicated in Strickland, the prejudice inquiry is substantively the same regardless of whether the defendant is challenging his conviction or his sentence:
 
 
 21
 When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
 
 
 22
 Id. at 695, 104 S.Ct. at 2068. In determining the existence of prejudice, the court must consider "the totality of the evidence before the judge or jury." Id.
 
 
 23
 In Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, the Supreme Court described the Strickland standard for ineffective representation as "highly demanding," and stressed that "[o]nly those habeas petitioners who can prove under Strickland that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ." Fully recognizing the rigorous nature of the Strickland test, we also keep in mind the wise counsel of Judge Wyzanski: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." United States ex rel. Williams v. Twomey, 510 F.2d 634, 640 (7th Cir.1975), certiorari denied, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (quoted in Cronic, 466 U.S. at 657, 104 S.Ct. at 2046).
 
 III.
 
 24
 The Sixth Amendment's requirement of effective assistance of counsel applies to a capital sentencing proceeding in the same manner in which it applies to the conviction phase of a criminal proceeding. As the Supreme Court explained in Strickland, 466 U.S. at 686-87, 104 S.Ct. at 2063-64:
 
 
 25
 A capital sentencing proceeding ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial--to ensure that the adversarial testing process works to produce a just result under the standards governing decision.
 
 
 26
 Under Illinois law, a capital sentencing proceeding has two phases. Ill.Rev.Stat. ch. 38, p 9-1. The first phase deals with whether the defendant may be sentenced to death at all. A defendant who has been found guilty of murder[1] and who at the time of the commission of the offense has attained the age of eighteen may receive the death penalty if the State establishes beyond a reasonable doubt the existence of one of the aggravating factors set out in p 9-1(b). In petitioner's case, the jury found in accordance with p 9-1(b)(6)[2] that petitioner, and not another party to the crime, had actually killed Donald Bivens intentionally during the course of an armed robbery.
 
 
 27
 The second phase of the capital sentencing proceeding concerns whether a death sentence should actually be imposed. Once there has been a finding that one or more of the factors set out in p 9-1(b) exists, the jury, or the court if sitting as sentencer, then proceeds to consider additional aggravating and mitigating factors, such as but not limited to those set out in p 9-1(c),[3] and determines whether the defendant should be sentenced to death. Paragraph 9-1(g) provides that "if the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." See also p 9-1(h) (same standard when court acts as sentencer). That same paragraph further emphasizes that "unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to a term of imprisonment." p 9-1(g). Again in petitioner's case, the jury unanimously found that there were no mitigating factors sufficient to preclude imposition of the death sentence, and the court consequently sentenced petitioner to death.
 
 
 28
 Petitioner's claims of ineffective assistance of counsel during the sentencing proceeding are all directed toward his attorney's performance during the second phase of that proceeding, the hearing on additional aggravating and mitigating factors. Petitioner's principal claim of attorney ineffectiveness during the sentencing hearing concerns the admission into evidence of the erroneous fact that petitioner had four prior felony convictions. The record reveals that at some time prior to the final phase of the sentencing proceeding, the Macon County State's Attorney, Patrick Walsh, approached petitioner's appointed attorney, Kenneth Kinser, and asked him if he would stipulate to the existence of four prior felony convictions on the basis of information contained in an "FBI rap sheet." Those convictions allegedly included: (1) a 1965 New York conviction for attempted felonious assault with a knife, (2) a 1966 New York conviction for felonious assault with a tire iron, (3) a 1966 California conviction for second degree robbery, and (4) a 1969 Minnesota conviction for bank robbery, for which he was on parole at the time of the Bivens murder. Mr. Walsh had secured certified copies of the California and Minnesota convictions, but he had not been able to obtain certified copies of the two alleged New York convictions.
 
 
 29
 Mr. Kinser showed the "rap sheet" to petitioner and asked him if it were accurate. Petitioner told Mr. Kinser that he thought the information was correct. Mr. Kinser apparently did not explain to petitioner the difference between an arrest and a conviction for purposes of the sentencing hearing, or the difference between a felony and a misdemeanor. On the basis of petitioner's response, Mr. Kinser agreed to stipulate to the existence of the four prior felony convictions despite the fact that the State did not have certified records of the New York convictions and could not have proved their existence had they been requested or required to do so. Mr. Kinser later explained that he thought it would be less damaging to petitioner to stipulate to the convictions rather than have the jury see the official copies embossed with gold seals. He also stated, however, that he never inquired whether Mr. Walsh actually had such copies in his possession.
 
 
 30
 During the second phase of the sentencing hearing, the court allowed Mr. Walsh to inform the jury of the four prior convictions and the sentences imposed in regard to each (three months for both the New York convictions, one year to life for the California conviction, and twenty years for the Minnesota conviction). Mr. Walsh then argued to the jury:
 
 
 31
 Here's a man who began a career of criminal activity in 1965 and 1966, with attempted assault with a knife, felonious assault with a tire iron, thirteen years ago. He then graduated, feeling that New York was no longer safe for his criminal pursuits, moved on to California. And in California committed second degree robbery, and received a sentence of one year to life, in the court in California in July, 1966. And after he was released from the penitentiary in California, he moved to Minnesota, figuring the east and west coasts were no longer safe for his activity, he'd try the midwest. And he moved to Minneapolis, worked on his talents there, and graduated to bank robbery, committed an armed robbery of a bank in Minneapolis, Minnesota in 1969. And received twenty years in prison.
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 And now Mr. Lewis comes from Minneapolis to Decatur, Illinois, not only commits the offense of bank robbery, but aggravated kidnapping and murder.... And I think that the evidence in this case, prior criminal convictions of this defendant simply show that he is a totally anti-social human being. And I think that your decision as to what ought to be done with him now ought to be made in that light.
 
 
 35
 (Trial Tr. B-288 to B-289).
 
 
 36
 When petitioner initiated post-conviction proceedings in the Illinois courts, the State's Attorney's Office again made efforts to obtain certified copies of the New York convictions. Usual efforts to obtain the records again proved unsuccessful, but by exploiting a connection with a New York City police detective, Assistant State's Attorney Jeff Justice and Assistant Attorney General Neal Goodfriend, both of whom were representing the State in the post-conviction proceedings, managed at some time during the post-conviction evidentiary hearing in 1983 to obtain certified records showing the disposition of the New York charges. These records indicated that the 1966 felonious assault charge had been dismissed and that with regard to the 1965 charge of attempted felonious assault, petitioner had pled guilty to a misdemeanor assault charge and received a three-month sentence. Despite the fact that these records conclusively established that the information which had been presented to the jury concerning petitioner's prior criminal record was inaccurate and false, Messrs. Justice and Goodfriend determined that they were under no obligation to disclose the New York records and accordingly withheld them from Steven Beckett, petitioner's counsel at that time, and from Judge Harold Jensen, who was presiding at the post-conviction hearing. Moreover, in the State's brief submitted to and during oral argument before the Illinois Supreme Court on appeal of the denial of post-conviction relief, Mr. Goodfriend represented that petitioner had four prior felony convictions, sometimes referring to the stipulation and sometimes not, even though he knew that that representation was false.
 
 
 37
 After the Illinois Supreme Court had affirmed the circuit court's denial of post-conviction relief and while certiorari was pending for the second time before the Supreme Court of the United States, petitioner's counsel was finally able, with the assistance of the NAACP Legal Defense Fund in New York, to obtain certified records indicating the disposition of petitioner's two New York arrests, information which the State had possessed for approximately two years. For the first time, petitioner's counsel learned that petitioner's prior criminal record introduced at the sentencing hearing was inaccurate and that the two alleged New York felony convictions were nonexistent. On February 11, 1986, his counsel filed a "Motion for a Supervisory Order and for Post-Conviction Relief" with the Illinois Supreme Court in which he informed the court of the contents of the New York records. The Illinois Supreme Court summarily denied petitioner's motion in March, although two justices dissented, finding that petitioner was entitled to a new sentencing hearing in light of the clearly inaccurate information which had been presented to the sentencing jury. People v. Lewis, 95 Ill.Dec. 371, 489 N.E.2d 1099 (1986) (Clark, C.J., and Simon, J., dissenting).[4]
 
 
 38
 Respondents contend that the issue of the accuracy of the New York convictions has been waived for purposes of federal habeas review because it was never presented to the Illinois courts until after the post-conviction proceedings were final. See Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594; Williams v. Lane, 826 F.2d 654, 659, 663 (7th Cir.1987). The district court found "cause" under Wainwright for the procedural default in "the fact that the Assistant State's Attorney and Assistant Attorney General concealed the evidence about the New York convictions from the petitioner and the post-conviction judge." Respondents argue that this finding runs counter to the Supreme Court's holding in Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397, that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." They contend that the information concerning the New York arrests and convictions was available in public records accessible to petitioner, and accordingly that the conduct of state officials in no way prevented petitioner from discovering the truth regarding the alleged New York convictions and raising his claim during the post-conviction proceedings.
 
 
 39
 The difficulty which the State encountered in attempting to secure records of fifteen-year-old convictions from another jurisdiction clearly belies this argument. Indeed the reason why Mr. Walsh approached Mr. Kinser in 1979 about stipulating to the existence of four prior felony convictions, including the two from New York, was that he had been unable to obtain copies of the New York convictions through ordinary channels. Moreover, in 1983 when the State was again attempting to secure copies of the New York convictions prior to the post-conviction hearing in Illinois circuit court, an investigator with the State's Attorney's Office found it necessary to rely on a personal contact in the New York City Police Department for assistance in ultimately obtaining the relevant records.
 
 
 40
 As an indigent death row inmate relying on the efforts of appointed counsel, petitioner did not have available to him all of the resources of the State in attempting to secure copies of the alleged New York convictions. He sought the help of the NAACP Legal Defense Fund in New York in locating the records, but that office was unable to produce certified copies of the New York records until the summer of 1985. Without the factual information contained in those records, any ineffective assistance of counsel claim based on Mr. Kinser's stipulation to the existence of the New York convictions would have been useless for petitioner would have been unable to demonstrate prejudice as a result of Mr. Kinser's error.
 
 
 41
 In Murray v. Carrier, 106 S.Ct. at 2646, the Supreme Court suggested that "a showing that the factual or legal basis of a claim was not reasonably available to counsel" would constitute cause under Wainwright v. Sykes. Petitioner has made a sufficient showing that the factual basis of his claim concerning the New York convictions was not reasonably available to his counsel before mid-1985. Moreover, had Messrs. Justice and Goodfriend disclosed the contents of the New York records to Judge Jenson and petitioner's counsel upon their receipt in 1983, petitioner would have been able to raise his claim during the post-conviction proceedings. To that extent we agree with the district court that the conscious decision of these two state officials deliberately to conceal crucial information relating to petitioner's sentencing was "an objective factor external to the defense [which] impeded counsel's efforts to comply with the State's procedural rules." Murray, 106 S.Ct. at 2646. Finally, petitioner did raise the accuracy of the New York convictions before the Illinois Supreme Court at the first available opportunity, in the form of the Motion for a Supervisory Order, but the Illinois Supreme Court declined the opportunity to comment on the merits and summarily denied the motion. For all of these reasons, petitioner has certainly established cause under Wainwright v. Sykes for any procedural default concerning the New York convictions.
 
 
 42
 That petitioner was prejudiced by Mr. Kinser's stipulation to the existence of two prior felony convictions which in fact did not exist can hardly be disputed. A defendant may not be sentenced "on the basis of assumptions concerning his criminal record which [are] materially untrue." Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690; see also United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (misinformation of a constitutional magnitude, such as uncounseled guilty pleas, may not be relied upon in imposing sentence); United States v. Cameron, 814 F.2d 403, 407 (7th Cir.1987). There is no dispute that the information concerning the New York convictions that was presented to the jury was untrue. We agree with the district court that it was also material. The difference between two prior felony convictions and four prior felony convictions in determining whether to impose the death penalty is without doubt significant. As the district court explained, while two prior convictions would constitute an aggravating factor bearing strongly on deciding the appropriate disposition of a case, "four prior convictions would indicate an absence of mitigating considerations and a life committed to criminal activity." 656 F.Supp. at 193. Furthermore, the two New York convictions were described to the jury as involving violent crimes of assault, namely, attempted felonious assault with a knife and felonious assault with a tire iron, which might have weighed particularly heavy in the balance of aggravating and mitigating factors. Particularly in light of the gravity and more importantly the irrevocability of the sentence ultimately imposed on petitioner, there is certainly a reasonable probability that, but for Mr. Kinser's unfortunate acquiescence in the admission of false evidence, the outcome of the proceeding would have been different, and petitioner would not have been sentenced to death.[5] Under the Illinois statute, if only one juror believed that there were mitigating factors sufficient to preclude the imposition of the death sentence, then petitioner would have been sentenced to a term of imprisonment. Ill.Rev.Stat. ch. 38, p 9-1(g).
 
 
 43
 The above discussion of the cause and prejudice requirements in connection with the procedural default clearly foreshadows our holding with respect to the ineffective assistance of counsel claim. With petitioner's life at stake, Mr. Kinser during a crucial phase of the sentencing hearing agreed to stipulate to the existence of four prior felony convictions without asking the State's Attorney whether he had actual proof of those convictions in the form of certified copies. Instead Mr. Kinser relied on petitioner's uninformed representation that he thought the information contained in the "FBI rap sheet" was accurate, without explaining to petitioner the importance of that information and the critical distinctions between arrest and conviction and between felony and misdemeanor. The district court noted that "a guardian ad litem in a probate proceeding for an incompetent would have insisted on strict proof from an adversary." 656 F.Supp. at 194. Certainly no less should be expected from defense counsel in a capital sentencing proceeding where the defendant's life rides on the outcome. Even if in part caused by the State's Attorney's behavior, Mr. Kinser's performance was grossly deficient and "shockingly inferior to what may be expected of the prosecution's representation." United States v. Weston, 708 F.2d 302, 306 (7th Cir.1983) (quoting United States ex rel. Williams v. Twomey, 510 F.2d 634, 640 (7th Cir.1975)), certiorari denied, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 340.
 
 
 44
 We have already set forth our belief that petitioner's defense was actually prejudiced by Mr. Kinser's regrettable representation with respect to the erroneous New York convictions. Indeed we believe that, whether or not prompted by the State's Attorney, counsel's error in this respect was so serious and the prejudice to petitioner so great that on this basis alone "counsel's conduct so undermined the proper functioning of the adversarial process that the [capital sentencing proceeding] cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. Petitioner is therefore entitled to a new sentencing hearing,[6] and we consequently need not pass upon any of the other claims of ineffective assistance of counsel relating to the sentencing phase which were raised by petitioner and considered by the district court.[7]
 
 
 45
 Although Mr. Kinser's conduct is of course the subject of our immediate concern, we also find the conduct of Assistant State's Attorney Justice and Assistant Attorney General Goodfriend to be equally shocking. These two representatives of the State deliberately withheld vital information from both the Illinois courts and petitioner and his counsel. See Ill.Rev.Stat. ch. 110A, Canon 7, Rule 7-103(b) ("A public prosecutor ... in criminal litigation shall make timely disclosure to counsel for the defendant ... of the existence of evidence, known to the prosecutor ..., that tends to negate the guilt of the accused or mitigate the degree of the offense."). Moreover, Mr. Goodfriend deliberately misrepresented petitioner's prior criminal record before the Supreme Court of Illinois on the post-conviction appeal when he had in his possession information conclusively indicating that petitioner had no New York felony convictions. See Ill.Rev.Stat. ch. 110A, Canon 7, Rule 7-102(a) (a lawyer shall not knowingly make a false statement of fact or use false evidence). What is most reprehensible about the conduct of these two individuals, however, is that if petitioner's attorney during the post-conviction and federal habeas proceedings, Mr. Beckett, had not been so diligent in securing official copies of the New York records and petitioner had eventually exhausted all of his opportunities for appellate review without obtaining any relief, petitioner could have been executed with two officials of the State of Illinois knowing that he had been sentenced "on the basis of assumptions concerning his criminal record which were materially untrue." Townsend v. Burke, 334 U.S. at 741, 68 S.Ct. at 1255.
 
 
 46
 We wholly agree with petitioner's observation that the Illinois court system and more importantly the people of Illinois have "an interest in ensuring that [Illinois'] death penalty statute is fairly applied to offenses committed within [the] jurisdiction, and a further interest to assure that death sentences are a product of accurate evidence, and not false evidence" (Petitioner's Br. 54). The conduct of Messrs. Justice and Goodfriend in no way promoted those interests; instead it seriously undermined them. Because their conduct raises serious questions as to the role of attorneys representing the State in capital cases, the relevant state disciplinary authorities should be informed of these events and therefore the clerk of this Court is directed to transmit a copy of this opinion to those authorities.
 
 IV.
 
 47
 On cross-appeal, petitioner challenges the district court's determination that petitioner was not denied effective assistance of counsel during the guilt phase of the prosecution. Petitioner alleges over twenty instances in which he claims Mr. Kinser was ineffective at trial. Of course, even if Mr. Kinser was grossly incompetent in each of these respects, petitioner is not entitled to any relief under the Sixth and Fourteenth Amendments unless he can demonstrate that his counsel's deficient performance actually prejudiced his defense, i.e., that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695, 104 S.Ct. at 2068. Unless a defendant shows both deficient performance and prejudice, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. at 2064.
 
 
 48
 It is often more difficult to determine whether counsel's performance was deficient than to determine that petitioner suffered no prejudice as a result of any alleged deficiencies. We noted in United States ex rel. Cross v. DeRobertis, 811 F.2d 1008, 1014 (7th Cir.1987), that the performance issue often requires "a particularly subtle assessment" of what the trial counsel did and failed to do. If a defendant was not prejudiced by the alleged delicts of his counsel, reaching the prejudice issue first will often obviate the need to rule definitively on the more difficult performance question. Id. The Supreme Court in Strickland expressly sanctioned this approach:
 
 
 49
 [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
 
 
 50
 466 U.S. at 697, 104 S.Ct. at 2069. This Court has on numerous occasions first addressed the prejudice component of the Strickland inquiry. See, e.g., Shepard v. Lane, 818 F.2d 615, 620 (7th Cir.1987) (collecting cases); Cross, 811 F.2d at 1014.
 
 
 51
 Every court that has reviewed petitioner's conviction has commented that the evidence against him was overwhelming. See People v. Lewis, 88 Ill.2d at 153, 58 Ill.Dec. at 906, 430 N.E.2d at 1357 ("the proof of guilt is overwhelming"); People v. Lewis, No. 79-CF-81, mem. op. at 10 (Ill.Cir.Ct. July 14, 1983) (post-conviction hearing) ("This Court has read the trial record. The evidence against petitioner was overwhelming.") (emphasis in original); People v. Lewis, 105 Ill.2d at 241, 85 Ill.Dec. 308, 473 N.E.2d at 907 ("We still believe" that evidence of petitioner's guilt, "if believed by the jury, was ample."); United States ex rel. Lewis v. Lane, 656 F.Supp. at 190 ("the evidence convicting Lewis was overwhelming"). It is important to understand precisely what the State was required to prove in order for petitioner to be found guilty of murder, armed robbery, and aggravated kidnapping. Of course guilty verdicts would be supported by evidence that petitioner physically participated in the three crimes. However, under Illinois' accountability statute, Ill.Rev.Stat. ch. 38, p 5-2(c), he could have been found guilty if "either before or during the commission of [the offenses], and with the intent to promote or facilitate such commission, he solicit[ed], aid[ed], abet[ted], agree[d] or attempt[ed] to aid, [another] person in the planning or commission of the offense[s]." Specifically with regard to the murder conviction, in view of the accountability statute the State did not need to prove that petitioner had shot Donald Bivens, only that he had given prior or contemporaneous aid to the other participants in the bank robbery scheme which resulted in the shooting. Cf. People v. Sangster, 91 Ill.2d 260, 262, 62 Ill.Dec. 937, 938, 437 N.E.2d 625, 626 (1982) (co-participant and alleged mastermind of Citizens National Bank robbery guilty of murder under accountability statute).
 
 
 52
 Even without resort to the particularly damaging testimony of Maurice Farris and Margaret Morgan, whose credibility petitioner vigorously attacks, there was a substantial amount of physical evidence tying petitioner to the bank robbery. A maroon Monte Carlo automobile rented by petitioner in St. Paul, Minnesota, shortly before the robbery was identified by three witnesses (Jodi Myers, Mary Comerford, and Norman Goenne) as having been used in the robbery and was later seized in Decatur in Maurice Farris' garage. An Illinois road map with petitioner's fingerprints on it was found inside the car when it was seized, along with a billfold containing identification of a Denise Lewis, an alias used by his sister Bernice. A .38-caliber handgun, identified by the testimony of a Minnesota gun handler and other witnesses as having been pawned to petitioner, was found in the Macon County landfill in the same area with Donald Bivens' gun and items identified by three of the bank tellers as having been in their briefcases on the morning of the robbery. Petitioner's brother-in-law testified that petitioner gave him a vodka box containing money and asked him to keep it safe for petitioner. The serial numbers on the money inside of the box matched those on the money which had been stolen from the Citizens National Bank. In addition, the fingerprints of Bernice and one of the bank tellers were found on the money. Telephone bills showed calls between petitioner's residences in Minneapolis and Des Moines and the Morgan and Sangster-Farris residences in Decatur both before and after the robbery. Finally, the testimony of two of Margaret Morgan's neighbors and one of her children placed petitioner and Bernice in the Morgan household from December 12 through 14, 1978.
 
 
 53
 On the basis of this evidence alone, it is virtually impossible to say that anything which Mr. Kinser could or should have done would have left the jury with a reasonable doubt as to petitioner's participation in some aspect of the bank robbery. When Farris' testimony concerning the planning of the robbery, the events of the day of the robbery, and petitioner's statement that "The guard went for his gun. I had to burn him," and Margaret Morgan's testimony that the petitioner and Bernice had stayed at her home between December 12 and 14, 1978, that she had observed petitioner and his sister counting money immediately after the robbery, that Bernice, in petitioner's presence, had asked her whether the guard had died, and that she had helped Bernice dispose of the guns, briefcases, and money wrappers from the robbery is added to the physical evidence laid out in the above paragraph, the evidence of petitioner's guilt is simply insurmountable. In light of this evidence, the alleged errors made by Mr. Kinser are insufficient to undermine confidence in the outcome of petitioner's trial. There is no reasonable probability that, but for those alleged errors, the verdict would have been any different.
 
 
 54
 Petitioner argues that it is inconsistent to hold that Mr. Kinser was constitutionally ineffective during the sentencing phase of the case but rendered reasonably competent representation during the guilt phase. Petitioner, however, has largely overlooked the prejudice component of Strickland on his cross-appeal focusing on the trial. Even so, we are not at all convinced that many of the errors alleged by petitioner to have occurred at trial fell outside of "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
 
 
 55
 Petitioner mounts a broad challenge to Mr. Kinser's general competence to handle petitioner's case based on his age, 63 at the time of the 1979 trial, and background. The record reveals that Mr. Kinser had handled over 100 criminal cases, one-half of which were felonies, although he had not done any criminal defense work in the four years prior to petitioner's trial. We must agree with the district court's conclusion that "there is nothing in this record to indicate that Mr. Kinser, by reason of his background, was not able to function as an adversary of the State's Attorney, or that he did not have the proper preparation or ability to be a reasonably effective lawyer for the petitioner." 656 F.Supp. at 190.
 
 
 56
 Petitioner also claims that Mr. Kinser believed that Lewis was guilty and continuously counseled him to plead guilty and avoid the death penalty. As the district court noted, nothing in the record indicates that Mr. Kinser publicly expressed any opinion that petitioner was guilty. 656 F.Supp. at 190. Moreover, in light of the substantial physical evidence against him, Mr. Kinser would have been derelict not to discuss the possibility of a guilty plea for a fixed term of imprisonment. See Tollett v. Henderson, 411 U.S. 258, 268, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235.
 
 
 57
 The large majority of the alleged errors involved strategic judgments by Mr. Kinser as to how best to defend petitioner. Petitioner claims that Mr. Kinser waived his opening statement, failed to cross-examine witnesses vigorously, failed to object to certain statements during the closing arguments, yielded the right of voir dire to the judge, failed to object when the prosecutor asked leading questions of certain witnesses, failed to move to exclude the petitioner's prior convictions during the trial phase, and lost the opportunity to impeach Maurice Farris by not having a third party present at Farris' interview. A defense counsel in a criminal trial is often called upon to make difficult choices among a number of legitimate options. The Supreme Court in Strickland recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689, 104 S.Ct. at 2065. Only if an act or omission is outside "the wide range of professionally competent assistance" will it be deemed unreasonable. Id. at 690, 104 S.Ct. at 2066.
 
 
 58
 We will briefly review some of petitioner's more serious allegations. One of petitioner's principal charges is that Mr. Kinser failed to interview potential alibi witnesses and to offer an alibi defense at trial. Petitioner maintained throughout the trial and continues to maintain that he was not present in Decatur at the time of the robbery. He contends that he was visiting relatives in Des Moines, Iowa, during the week of December 11, 1978. Various family members allegedly saw him in Des Moines, and Mary Ann Byrd, a friend of the family, was apparently ready to testify that petitioner had been cohabiting with her when the shooting occurred.
 
 
 59
 We agree with the district court and the Illinois Supreme Court that the record supports the conclusion that the decision not to put the alibi witnesses on the stand, although they were present at the trial, was strictly one of trial strategy. Mr. Kinser made several appointments to interview the Iowa witnesses in his office in Illinois, but they never appeared at the designated times. Mr. Kinser and defense counsel for Bernice together contacted an attorney in Des Moines who interviewed the witnesses there. That attorney told Mr. Kinser that it was her opinion that the witnesses were not credible and that they would lie on the stand to protect petitioner and Bernice. Bernice and her counsel decided not to have these alibi witnesses testify because the jury would quickly perceive that they were lying and that that would do far more damage to Bernice's case than the absence of contrary evidence. Mr. Kinser was equally justified in reaching that same strategic judgment on behalf of petitioner. Although petitioner maintained he was in Iowa, he was unable to offer any explanation to rebut the physical evidence tying him to Decatur, other than alleging that his car had been stolen in Des Moines. Unless Mr. Kinser was able satisfactorily to explain away that evidence, a progression of witnesses claiming that petitioner was in Iowa at the time of the crime might have done far more to convince the jury that he was guilty than Mr. Kinser's chosen strategy of emphasizing the lack of direct identification of petitioner and his sister by any of the victims of the robbery. Indeed, after hearing the testimony of these alibi witnesses at the post-conviction hearing, Judge Jenson wrote:
 
 
 60
 At times the testimony of a witness is inconsistent within itself. The testimony of some is inconsistent with their Grand Jury testimony. Collectively, the testimony is inconsistent, in a number of respects, from witness to witness. The Court cannot indulge in some speculation that had Kinser pursued all of this further before trial he somehow would have been able to clean it up to make it reasonably presentable.... There was no prejudice to petitioner in not presenting it. Moreover, it not only would not probably have changed the outcome, it would have probably destroyed any slim chance the petitioner then had.
 
 
 61
 People v. Lewis, No. 79-CF-81, mem. op. at 20 (Ill.Cir.Ct. July 14, 1983).
 
 
 62
 Petitioner also claims that Mr. Kinser failed to insist on a mistrial after an FBI agent testified about seeing Lewis in the presence of his probation officer. The trial court indicated that it was prepared to grant petitioner a mistrial if he so desired, but that it would set petitioner's case for trial anew with accomplice Willie T. Sangster, who had originally been joined with petitioner but who subsequently managed to obtain a continuance. Although petitioner did not want to proceed to verdict with the jury that had heard the FBI agent's testimony, petitioner was also adamant about not wanting to be tried with Sangster. Hindsight suggests that Mr. Kinser perhaps should have insisted on a mistrial and attempted to have petitioner's case severed from Sangster's. Instead, rather than risking the possibility that petitioner would be later tried with Sangster, the mastermind of the crime according to the prosecution's theory, Mr. Kinser decided to withdraw his motion for a mistrial and the court thoroughly admonished the jury to disregard the improper and prejudicial testimony. Petitioner now claims that Mr. Kinser acted against his wishes in withdrawing the motion, but what petitioner really wanted was to have the indictment dismissed, a wholly unrealistic option. Considering the alternatives available to Mr. Kinser at the time, his choice to go forward was not professionally unreasonable. Furthermore, as the Illinois Supreme Court concluded, the testimony and evidence of petitioner's guilt, if believed, were overwhelming, and there was no reasonable possibility that, but for the FBI agent's reference to petitioner's probation officer, petitioner would not have been convicted.[8] 88 Ill.2d at 158, 58 Ill.Dec. at 909, 430 N.E.2d at 1360.
 
 
 63
 Finally, petitioner claims that Mr. Kinser failed to make use of an FBI lab report concerning hair sample analyses and the results of a paraffin test on Maurice Farris. During the initial investigation of the case, police found two negroid hairs suitable for analysis. One was found in one of the ski masks used in the robbery; the other was found in the back-seat area of the maroon Monte Carlo automobile used in the robbery. These hair samples were compared with hair standards obtained from petitioner, Bernice, and Maurice Farris. The FBI analysis excluded all three persons as the source of the hair found in the ski mask and the Lewises as the source of the hair found in the back seat of the Monte Carlo, but was inconclusive with regard to Farris as the source of the hair found in the car. At the post-conviction hearing, the FBI agent who conducted the hair-sample analyses testified that there was no scientific value in his inability either to exclude or to identify Farris as the source of the hair in the car. Mr. Kinser never introduced the results of the hair-sample analyses into evidence at the trial.
 
 
 64
 In cross-examining Maurice Farris, Bernice's counsel brought out the fact that the results of a paraffin test administered on Farris shortly after he had been arrested on the evening of the robbery indicated the existence of burnt powder residue on Farris' left hand, suggesting that he had recently fired a gun. Both Mr. Kinser and Bernice's counsel relied on this fact during their closing arguments to suggest that Farris was actually the person who shot Donald Bivens. In rebuttal, Mr. Walsh, the State's Attorney, reminded the jury that several of the bank tellers had testified that the person who shot Bivens had worn gloves. Mr. Walsh also told the jury that Farris had testified that when he dropped petitioner and Bernice off at Mrs. Morgan's house after the robbery, he lifted one of the suitcases out of the back seat of the car and handed it to petitioner. If petitioner had shot Bivens and then carried a suitcase back to the car, he could have left gunpowder residue on its handle, which if then touched by Farris could certainly explain the residue on his left palm.
 
 
 65
 Petitioner argues that Mr. Kinser did not make effective use of both the paraffin and hair-sample tests in impeaching the credibility of Farris' testimony and suggesting that Farris, not petitioner, was the trigger person. Because Farris' hair was not ruled out as the source of the hair in the back seat, petitioner theorizes that the hair-sample analysis shows that Farris lied when he testified that he drove the Monte Carlo, and that Farris actually sat in the back seat of the car and was one of the robbers at the scene. Petitioner also emphasizes the fact that the State's Attorney's Office did not learn of the results of either the paraffin test or the hair-sample test involving Farris until after they had granted Farris full immunity. Petitioner contends that had this information reached the State's Attorney's Office earlier, Farris would never have been granted immunity. Faced with their mistake, the State's Attorneys were left with no choice but to proceed on the theory that petitioner was the person who shot Bivens.
 
 
 66
 Petitioner's argument on the basis of the inconclusive results of Farris' hair-sample analysis is strained at best. Even if Farris' hair had been identified as compatible with the source of the hair taken from the back seat of the Monte Carlo, such a finding would not necessarily be inconsistent with Farris' being the driver of the car. Similarly, the State's Attorney's argument as to how Farris managed to get gunpowder residue on his palm is certainly plausible, particularly in light of the testimony that the person who shot Bivens wore gloves. However, even if we were to accord more weight to this evidence than it appears to warrant, the most that it might possibly do would be to create some doubt as to whether petitioner actually fired the gun. It in no way raises a reasonable doubt that petitioner was not in some way involved with the robbery of Citizens National Bank. There is simply too much physical evidence tying him to Decatur and the robbery to conclude otherwise. Under the accountability statute, petitioner would have been found guilty of murder, like his sister Bernice and accomplice Sangster, even if he were not the trigger person. Thus, even if we were to hold, which we do not, that Mr. Kinser erred in failing to pursue more forcefully the results of the paraffin and hair-sample tests, there is no reasonable probability that, but for that error, the jury would have been left with a reasonable doubt concerning petitioner's guilt.[9]
 
 
 67
 We do note, however, that some of this evidence may be of particular relevance at petitioner's new sentencing hearing. If the State again chooses to seek the death penalty for petitioner, it will first have to establish beyond a reasonable doubt the existence of one of the aggravating factors set out in Ill.Rev.Stat. ch. 38, p 9-1(b). The only aggravating factor in that subsection under which petitioner might qualify is (b)(6), which requires a showing that petitioner actually killed Donald Bivens during the course of an armed robbery. Petitioner's counsel at the resentencing hearing will be free to, and of course presumably should, introduce evidence of the results of the paraffin tests and the hair-sample analyses and then present petitioner's theory of the shooting, based on these results, to the jury. Counsel will also have the opportunity to develop any other evidence which might create a reasonable doubt about whether it was petitioner who did the actual shooting.[10] We again emphasize, though, that the fact that petitioner may not have been the shooter does not undermine our confidence in the jury's verdict that petitioner was guilty of murder or our belief that the outcome at the guilt phase was just.
 
 V.
 
 68
 For all of the reasons set forth above, the judgment of the district court is affirmed. A writ of habeas corpus shall issue in this case vacating petitioner's sentence of death. Execution of the writ is stayed on condition that the State of Illinois grant petitioner a new sentencing hearing within a reasonable time not to exceed ninety days, and diligently and without delay proceed with that hearing to final conclusion. We also direct the clerk of this Court to send a copy of this opinion to the relevant state disciplinary authorities in accordance with Part III of this opinion. See supra p. 1459. Costs to be borne by the respective parties.
 
 
 
 [1]
 P.A. 84-1450, effective July 1, 1987, created the offenses of first-degree murder and second-degree murder. Accordingly, p 9-1(b) infra has been amended to provide that to be eligible for the death penalty, a defendant must have been found guilty of first-degree murder. However, the definition of first-degree murder, Ill.Rev.Stat. ch. 38, p 9-1(a) (Supp.1987), is substantively identical to the definition of murder that was in effect in 1979, Ill.Rev.Stat. ch. 38, p 9-1(a) (1981). For a definition of second-degree murder, see Ill.Rev.Stat. ch. 38, p 9-2 (Supp.1987)
 
 
 [2]
 At the time petitioner was sentenced in 1979, p 9-1(b)(6) provided that a defendant could be sentenced to death if:
 
 
 [6]
 the murdered individual was killed in the course of another felony if:
 (a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and
 (b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and
 (c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child.
 Ill.Rev.Stat. ch. 38, p 9-1(b)(6) (1981). Paragraph 9-1(b)(6) has since been amended and presently provides that a defendant may be sentenced to death if:
 
 
 [6]
 the murdered individual was killed in the course of another felony if:
 (a) the murdered individual:
 (i) was actually killed by the defendant, or
 (ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable under Section 5-2 of this Code, and the physical injuries inflicted by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual; and
 (b) in performing the acts which caused the death of the murdered individual or which resulted in physical injuries personally inflicted by the defendant on the murdered individual under the circumstances of subdivision (ii) of subparagraph (a) of paragraph (6) of subsection (b) of this Section, the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another; and
 (c) the other felony was one of the following: armed robbery, robbery, aggravated criminal sexual assault, aggravated kidnapping, forcible detention, arson, aggravated arson, burglary, home invasion, or the attempt to commit any of the felonies listed in this subsection (c).
 Ill.Rev.Stat. ch. 38, p 9-1(b)(6) (Supp.1987).
 
 
 [3]
 Paragraph 9-1(c) provides, as it did in 1979:
 (c) Consideration of factors in Aggravation and Mitigation. The court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to those factors set forth in subsection (b). Mitigating factors may include but need not be limited to the following:
 
 
 [1]
 the defendant has no significant history of prior criminal activity;
 
 
 [2]
 the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;
 
 
 [3]
 the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;
 
 
 [4]
 the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;
 
 
 [5]
 the defendant was not personally present during commission of the act or acts causing death
 Ill.Rev.Stat. ch. 38, p 9-1(c) (Supp.1987).
 
 
 [4]
 At the time he filed his motion with the Illinois Supreme Court, petitioner had not yet discovered that the State had had in its possession since 1983 certified records evidencing the disposition of the New York charges. Thus, in ruling on the motion, the court did not have the benefit of that information
 
 
 [5]
 Respondents argue that petitioner was not prejudiced by the fact that the jury was told that he had four prior felony convictions because they have allegedly discovered a previously unknown California conviction for battery, for which petitioner was sentenced to one year probation. If one of the erroneous New York convictions were replaced with the alleged California conviction, they claim, petitioner would still have three prior felony convictions and a New York misdemeanor conviction. Of course this newly discovered conviction does not alter the fact that the death sentence imposed on petitioner in May 1979 was based on false and inaccurate information as to his prior criminal record. As this Court recently had the opportunity to explain in United States ex rel. Cross v. DeRobertis, 811 F.2d 1008, 1016 (7th Cir.1987), "the task of [a federal habeas court] is to assess the fairness of the original trial--not to predict the outcome of a future state proceeding."
 
 
 [6]
 In light of our disposition with regard to petitioner's death sentence, there is no reason for us to reach at this time the arguments presented by respondents on appeal concerning the constitutionality of the Illinois Death Penalty Act, Ill.Rev.Stat. ch. 38, p 9-1
 
 
 [7]
 These claims included Mr. Kinser's failure to marshall and present mitigating evidence of petitioner's social background to focus the jury's attention on petitioner's individuality as a human being, instead of relying almost exclusively on a religious and moral appeal; Mr. Kinser's failure to object to an inflammatory and prejudicial remark in Mr. Walsh's final argument; and Mr. Kinser's failure either to object to a statement by Mr. Walsh during his final argument which mischaracterized a jury instruction by suggesting that a finding of mitigating factors sufficient to preclude imposition of the death penalty would have to be unanimous, or to correct that misstatement in his own final argument. See United States ex rel. Lewis v. Lane, 656 F.Supp. at 193
 
 
 [8]
 In addition to his ineffective assistance claim, petitioner claims that his due process rights were violated when the court did not force him to accept a mistrial. As discussed in the text, petitioner wanted his indictment dismissed; he was unwilling to consider the realistic alternatives open to him, either to take the mistrial and risk a future trial with Sangster or after proper admonishment to proceed with the jury that had heard the remark. Petitioner's counsel was required to choose between these options, and petitioner reluctantly agreed with counsel's decision to proceed. Petitioner has presented no support for his claim that despite the strategic judgment by him and his counsel to proceed with the case, the court had an obligation to order a mistrial against their wishes and force petitioner to risk a new trial with Sangster. Indeed, if the court had actually pursued that course, petitioner might have had a bona fide due process claim, and perhaps even a claim that a new trial would have violated his rights under the Fifth Amendment's Double Jeopardy Clause
 Petitioner also suggests that his due process rights were violated by the trial court's "conditioning" the grant of the mistrial motion on petitioner's being later tried with Sangster. Both the district court and the Illinois Supreme Court rejected this argument. The Illinois Supreme Court in particular found that "[t]he judge, in discussions with defendant, made it clear that motions for severance would be considered later if it appeared that a joint trial would prejudice defendant." 88 Ill.2d at 157, 58 Ill.Dec. at 908, 430 N.E.2d at 1359. Absent such a showing, however, the joinder of petitioner and Sangster was perfectly permissible under Illinois law. See Ill.Rev.Stat. ch. 38, paragraphs 114-7 and 114-8 (1981). Indeed their cases had originally been consolidated, and Sangster would have been tried with petitioner and Bernice had he not obtained a continuance.
 
 
 [9]
 In addition to the ineffective assistance claim, petitioner also raises a substantive claim under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, that his due process rights were violated as a result of the prosecution's alleged failure to provide him or his counsel with copies of the written FBI laboratory report relating the results of the hair-sample analyses. Although there is some confusion as to whether Mr. Kinser actually received copies of those reports, the record does establish that he knew the results of the tests conducted on petitioner's and Bernice's hair standards, that the report of the hair-sample analyses, including the one done on Farris' hair standard, was hand-carried from the FBI laboratory in Washington, D.C. to Champaign County, Illinois where the trial was in session, and that three copies of the report, presumably one for the prosecution and two for defense counsel, were delivered to Mr. Walsh at the courthouse on May 21, 1979. We agree with the district court that the evidence certainly does not support the conclusion that the prosecution deliberately withheld information requested by petitioner. 656 F.Supp. at 189. We also agree with the district court that even assuming arguendo that there was a Brady violation, petitioner cannot satisfy the materiality test of United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. Considering the totality of the evidence against him, the hair-analysis evidence alone could not have raised a reasonable doubt concerning his guilt by virtue of his participation in the robbery scheme. At most it would have created a slight doubt as to whether it was petitioner who actually shot Donald Bivens, a fact relevant only for the sentencing phase of his prosecution
 
 
 [10]
 For example, petitioner argues that Mr. Kinser should have investigated a prior conspiracy to rob the Citizens National Bank in the spring of 1978 involving Willie Sangster and an individual named Johnny Ricks. The record does not reveal whether any criminal charges were ever brought in connection with that alleged conspiracy